### LOUIS C. ROGERS V. STATE OF NEBRASKA.

#### FILED APRIL 17, 1913.   No. 17,631.

1. **Homicide:** EVIDENCE. The substance of the evidence stated in the opinion, and *held* sufficient to sustain the verdict.

2. **Criminal Law:** MISCONDUCT OF OFFICERS: NEW TRIAL. Alleged misconduct of the prosecuting attorney and the sheriff, in furnishing statements to newspaper reporters relating to the crime alleged to have been committed by the defendant, is not available as a ground for a new trial, unless it is shown that the news items published and complained of were read by or brought to the notice of some of the jurors before whom the defendant was tried, or that such publications resulted in some way to prevent him from having a fair trial.

3. ———: INSTRUCTIONS. If the record in a prosecution for murder contains no evidence which would justify a conviction for the lesser degree of. manslaughter, the giving of an instruction by which that crime is not completely defined is not a sufficient ground for reversing a judgment of conviction for murder in the second degree.

ERROR to the district court for Dodge county: CONRAD HOLLENBECK, JUDGE. *Affirmed.*

*F. Dolezal* and *F. W. Button,* for plaintiff in error.

*Grant G. Martin, Attorney General, Frank E. Edgerton* and *J. C. Cook, contra.*

BARNES, J.

Louis C. Rogers, hereafter called the defendant, was tried in the district court for Dodge county on an information in which he and one Caroline Richter were charged with the murder of her infant child. Defendant had a separate trial, and the jury found him guilty of murder in the second degree. His motion for a new trial was overruled. He was sentenced to serve a term of 12 years in the state penitentiary, and has brought the case to this court by a petition in error.

Defendant contends, among other assignments of error, that the evidence is not sufficient to sustain the verdict for the following reasons: First, the venue was not established by sufficient evidence. Second, the *corpus delicti* was not established. Third, the defendant is not shown to have been connected with the commission of the crime. These questions will be considered and determined in the order above stated.

It appears from the record that Caroline Richter was the mother of seven children prior to the birth of the child in question. For some considerable time she had not been living with her husband, but had been traveling and cohabiting with the defendant since about the month of March, 1910. He was engaged in the theatrical business. Traveling with them was Gertrude, the 16-year-old daughter of Mrs. Richter. It appears that for several months during the year 1910 the defendant and Mrs. Richter lived in a flat conducted by a Mrs. Radier, at No. 45 Broadway street, in Detroit, Michigan. About the month of January, 1911, Mrs. Richter became aware that she was pregnant. The defendant insisted that she was not fit to raise a child for him, and he did not want her to have it. On August 1, 1911, Mrs. Richter and her three children left the defendant at Boone, Iowa, and started for the city of Omaha. They reached Omaha on that day, and after staying there two nights they went to Fremont, Nebraska, where they were joined by the defendant. The defendant and Mrs. Richter occupied the same room at the Albany hotel in Fremont, Dodge county, Nebraska, on Saturday night, the 5th day of August, 1911, and her children occupied another room in the hotel some distance therefrom. It appears that Mrs. Richter left her room and went to a drug store for whiskey and bromide at 2 o'clock on Saturday afternoon. She then returned to her room, which she occupied with the defendant, and did not leave it until the following day. She testified that she was pregnant when she came to Fremont; that she was sick that night, and was unconscious during her sick-

ness; that when she awoke Sunday morning she found she had given birth to a child during the night. The defendant was in the room when she awoke. She cried, and asked him where her baby was, and he replied: "The baby is better off, and so are you." Without further comment, we think it sufficient to say that the testimony of Mrs. Richter and her 16-year-old daughter, with that of several disinterested witnesses, fully warranted the jury in finding, beyond a reasonable doubt, that the child was born at the time and place alleged in the information. There was some conflict in the evidence; but, the question of the venue having been submitted to the jury under instructions by which the rights of the defendant were carefully guarded, we find no warrant for setting aside the verdict so far as it relates to that question.

It is further contended that the evidence is not sufficient to establish the fact that the child in question was born alive; or ever had other than foetal life. When the body of the dead child was found in the box-car at Colon, there was a towel knotted so tightly about its throat that its neck was reduced to half the size of that of a normal infant. The body of the child was carefully examined by Doctor John Smith, a physician of learning and experience. His competency as an expert witness is not questioned. He testified that, in his opinion, the child had independent life before it died; that he made every examination possible, without performing an autopsy; that it was a full-time child, and every appearance of the body indicated death by strangulation, such as the protruding of the eyes, the swollen and distended tongue, the color of the child's face where the blood had stagnated, the arched chest, and all other signs spoke clearly of murder.

It is true that Doctors Haslum and Leak, as witnesses, testified for the defendant that, in their opinion, a conclusive judgment could not be reached on that question without an autopsy. But they admitted, however, that all of the indications as described by Doctor Smith were that the child had met with a violent death. The body of

the child, as it was found in the box-car, was fully described by the coroner of Saunders county, and by Doctor Smith. No objections were made to the charge given by the court upon this particular question, which was fully and carefully presented to the jury. It was within their power to decide whether or not the child was born alive and then murdered. That was a fact to be determined by the jury in view of all of the circumstances of the case. Wharton, Homicide (3d ed.) sec. 374; *Hubbard v. State,* 72 Ala. 164. The question having thus been left to the jury under proper instructions, and they having resolved adversely to the defendant's contention, a court of review should not set aside the verdict.

It is further contended that the evidence was not sufficient to connect the defendant with the commission of the crime. The fact that the defendant was the father of the child is not disputed. It is admitted that he had cohabited with Mrs. Richter for a year and a half previous to its death. They had traveled about the country together, and she testified that when she became aware of her condition she talked with the defendant at different times about the coming of the child. She further testified that he said to her that he did not want a baby; she was not fit to raise a child for him, and he did not want her to have it. The defendant himself stated to the officer before his trial that Mrs. Richter was anxious to have the child and raise it.

There is nothing else in the record which indicates in any way that either of the parties desired or sought to procure an abortion. As above stated, the evidence shows that the child was not born prior to the time of their arrival in Fremont; and, when her actions are considered, the only conclusion that can be drawn is that the child was born in the room she occupied in the Albany hotel, on Saturday night, August 5, 1911. It is conceded that the defendant was with her in the room at the time. Again, the towel, which was tightly knotted about the neck of the child, had a laundry mark, to wit, "45 R." This

towel was fully identified by Mrs. Radier, who was the proprietress of the rooming house at 45 Broadway street, Detroit, Michigan. She testified that she had known the defendant for two years; that he and Mrs. Richter stayed at her house in Detroit from five to seven weeks. Her laundry mark for years had been "45 R." She stated positively that the defendant and Mrs. Richter carried away one of her towels, thus marked; that she saw one of them in their suitcase before they left. She examined the towel that had been taken from the child's neck, and positively identifed it as one of her towels.

It will be remembered that Mrs. Richter testified that, when she was awakened on Sunday morning, she discovered the loss of her baby, and asked for it. Defendant's reply was: "The baby is better off, and so are you." The testimony also shows that the defendant and Mrs. Richter were both at the depot on Sunday morning, August 6, 1911; that she and her little daughter secured, in the express office at Fremont, the brown wrapping paper and the string which were about the child when it was found. The testimony of the railroad men in charge of the cars in the Fremont yards shows that the car in which the child was discovered at Colon came to Fremont on the night of August 3 or the morning of August 4. It was unloaded on that day. After it was unloaded it was left standing just east of the Union station, about three blocks. The car left Fremont on what was called "train 41," between 12 and 1 o'clock, August 7, 1911. Between 2:30 and 2:40 o'clock that afternoon the bundle wrapped in brown paper was discovered in the car by an employee of an elevator firm at Colon, Nebraska. Other witnesses testified that on Sunday morning a package wrapped in brown paper was noticed in the waitingroom of the Fremont station. Mrs. Richter testified that the defendant was at the depot at the same time she was, but was not with her all of the time; that when she went to secure clean clothes for the children she saw the defendant on the north side of the depot, and he asked her why she did not wait in there.

The testimony shows that the mother had expressed a desire to have the child and raise it; that it was a great sorrow to her when she learned that the baby was gone. Defendant was the only person who had a motive for getting rid of the child. He did not want to be bothered with it in the first place. He stated that the woman was not good enough to be the mother of his child. Of course, there is no direct evidence that the defendant tied the towel about the neck of the child and strangled it, but the circumstances are such that the jury could hardly reach any other conclusion. Every reasonable hypothesis, except that of his guilt, seems to have been eliminated by the evidence, and, as we view the record, the jury were justified in finding that the child was born alive, in Fremont, and the crime with which the defendant was charged was committed by him at the time and place as alleged in the information.

It is also contended that the prosecution was guilty of such misconduct as entitles the defendant to a new trial. To support this contention the attorneys for the defendant have attached to the bill of exceptions news items published in Fremont papers after defendant's arrest. It is claimed that the items in question were furnished to the newspaper reporters by the county attorney and the sheriff of Dodge county. We find no showing in the record that any member of the jury ever read the articles of which complaint is made, or that they in any manner influenced the jury in arriving at their verdict. The record merely shows that the newspaper reporters were alert and successful in obtaining some of the facts relating to the transaction which was the foundation for the charge on which the defendant was prosecuted.

The defendant also contends that there was error in the sixth paragraph of the instructions given by the court upon his own motion. That paragraph defined the crime of manslaughter as follows: "If any person shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer in the com-

mission of some unlawful act, every such person shall be deemed guilty of manslaughter." It will be observed that the defendant's criticism is directed to the omission of the verb "is." It may be conceded that the verb should have been inserted immediately after the word "slayer" in the third line of the instruction. This accidental omission, however, is not of sufficient importance to require us to set aside the verdict and grant the defendant a new trial. No person of common sense, possessed with a common understanding of our language, could be misled by this omission.

Finally, it is contended that the court erred in omitting the words, "while the slayer is in the commission of some unlawful act," in the fourteenth paragraph of the instructions, and it is argued that if this omission had not occurred the jury might have found the defendant guilty of the crime of manslaughter, instead of murder in the second degree. It appears that in other instructions the crime of manslaughter had been correctly defined, and we are unable to see how the jury could have been misled or confused by the omission in question, and from a careful reading of the record we are satisfied that such was not the result. The jury having found the defendant guilty of murder in the second degree, it is apparent that they thoroughly understood the instructions as applied to the evidence. In fact, we are unable to see how the jury could have convicted the defendant, if at all, of any less crime than that of murder in the second degree. It appears beyond question that whoever knotted the towel about the neck of Caroline Richter's child did not perform that act unintentionally. It must have been intentionally and maliciously done. As we view the evidence, it contains no element of manslaughter, and the giving of the instruction, if erroneous, was error without prejudice.

After a careful examination of the record, we find that it contains no reversible error; that the evidence was sufficient to sustain the verdict; and the judgment of the district court is

AFFIRMED.